IN RE: LOCAL SERVICE
CORPORATION,
Debtor.

Simon E. Rodriguez, Chapter
7 trustee, Plaintiff,

v.

Allen Gelman, Personal Representative
for the Probate Estate of Barry Kap-
lan, Deceased, Benjamin L. Henschel,
Jeffrey Weinman, Chapter 7 Trustee,
Cal–Three, LLC, and Alpine Bank,
Defendants.

Bankruptcy Case No. 08–15543 EEB
Adversary Proceeding No. 12–1532 EEB

United States Bankruptcy
Court, D. Colorado.

September 23, 2013

D. Bruce Coles, Centennial, CO, for Jeffrey A. Weinman, Chapter 7 Trustee, Defendant.

Philip J. Giacinti, Jr., Denver, CO, for Alpine Bank, Defendant.

Maria J. Flora, Denver, CO, for Simon E. Rodriguez, Plaintiff.

### ORDER GRANTING SUMMARY JUDGMENT

Chapter 7

Elizabeth E. Brown, Bankruptcy Judge

THIS MATTER comes before the Court on cross motions for summary judgment

filed by Plaintiff Simon E. Rodriguez (the "Trustee") and Defendant Alpine Bank (the "Bank"). The Trustee obtained a default judgment in another adversary proceeding that a related entity was the Debtor's alter ego and, therefore, the related entity's assets would become the assets of this estate, including certain real property located in Park County. The Bank has asserted in this action that its prepetition judgment lien recorded in Park County against this Debtor ("LSC") automatically attached to the real property recovered by the Trustee postpetition, by virtue of the "after acquired" property clause in Colorado's judgment lien statute. Central to this dispute is whether a bankruptcy filing prevents the attachment of what would otherwise be a valid after-acquired judgment lien. This appears to be an issue of first impression in this jurisdiction.

## I. BACKGROUND

John Watson ("Watson") was a real estate developer who conducted his business through numerous entities. One of his development projects, known as the Breckenridge Mountain Estates, was located in Park County, Colorado. On June 26, 2006, Watson caused LSC, to convey whatever interest it held in Lots 5, 7, 8, 14, 15 and 16 of the Breckenridge Mountain Estates (the "BME Lots") to another of his related entities, Skyline Estates, LLC ("Skyline") by means of a quit claim deed. On August 9, 2006, Watson also quit claimed to Skyline whatever individual interest he held in the same lots. Approximately six months later, on February 13, 2007, the Bank obtained a judgment against LSC and Watson (but not Skyline) in the amount of $2,150,750.12 in Summit County District Court. On April 19, 2007, the Bank recorded a transcript of its judgment in Park County, Colorado. At the time of the Bank's recording, only Skyline held title to the BME Lots.

In July, 2007, the Bank initiated another lawsuit, this time in Denver District Court, to recover fraudulent conveyances made by Watson and LSC of Denver real estate (the "Denver Action"). The Bank filed a notice of lis pendens as to the Denver property on July 19, 2007. This action, however, did not involve the BME Lots in Park County.

A few months later, on September 28, 2007, Watson filed a chapter 11 bankruptcy petition, which he later voluntarily converted to chapter 7. Defendant Jeffrey Weinman ("Weinman") was appointed as the chapter 7 trustee for his estate. Among the assets of the Watson estate was Watson's 100% ownership interest in LSC. As successor to this interest, Weinman caused LSC to file its own chapter 11 petition on April 25, 2008. At the time of both the Watson and LSC bankruptcy filings, Skyline continued to hold title to the BME Lots.

Soon after the filing of the LSC bankruptcy case, the Bank removed the Denver Action to the bankruptcy court and sought to join LSC as a party plaintiff. The Court substituted LSC as plaintiff, but LSC dismissed the removed case on October 16, 2008. Later that same day, LSC filed a new adversary proceeding with the Watson estate as a co-plaintiff, asserting the same claim to recover the Denver real estate as a fraudulent conveyance. Once again, the new action did not include any claim to recover the BME Lots.

On June 25, 2008, LSC filed a separate adversary proceeding, *Estate of Local Service Corporation v. KC Webb Properties, LLC, et al.*, Adversary Proceeding No. 08–1454 EEB (the "KC Webb AP"), seeking to recover various assets transferred by LSC to six different defendants prior to the bankruptcy filing. One of these defendants was Skyline. In its complaint, LSC

sought to avoid its prior quit claim transfer of the BME Lots to Skyline as an intentional fraudulent transfer. In addition, LSC requested a court order piercing the corporate veil of Skyline. On September 8, 2009, LSC requested, and the Court entered, a default judgment in favor of LSC (the "Skyline Order"), which stated in part:

> Specifically, the Court holds that Skyline and LSC are alter egos of one another and that LSC used the corporate fiction of Skyline to shield LSC's assets from LSC's creditors. Accordingly, the Court reverse pierces the corporate veil between Skyline and LSC and holds that all assets held in the name of Skyline belong to the Estate.

Order Granting Plaintiff's Motion for Default Judgment and Judgment Against Defaulting Parties, at ¶ 13, Adv. Pr. No. 08–1454 EEB (Bankr.D.Colo. Sept. 18, 2009), Docket No. 79. The Skyline Order specifically awarded the BME Lots to LSC's estate. *Id.* at ¶ 14. Although the allegations of LSC's complaint in the KC Webb AP included a discussion of the Bank's judgment against LSC, the Bank was not a party to that proceeding, and LSC did not request any rulings in regard to the Bank's lien rights, if any, against the BME Lots.

LSC subsequently converted its case to chapter 7, and the Trustee was appointed to administer LSC's chapter 7 estate. The Trustee obtained court approval to sell the BME Lots free and clear of liens for $270,000, with any liens and encumbrances to attach to the sales proceeds. He then filed this adversary proceeding on August 21, 2012 to obtain a determination of the validity, extent and priority of liens asserted against the proceeds of the BME Lots by several parties, including the Bank.[1]

## II. DISCUSSION

■ In his summary judgment motion, the Trustee asserts that he is entitled to declaratory relief, holding that the Bank does not have a lien against the BME Lots because, at the time the Bank acquired its judgment lien, Skyline, not Watson or LSC, held title to the lots. He further argues that the fact that LSC had fraudulently transferred its interest in the BME Lots does not automatically establish a judgment lien in the Bank's favor as to these lots. This Court agrees. When a judgment creditor seeks to obtain a lien on real property fraudulently transferred by the judgment debtor to another, it must first file an action to uncover the fraud, file a notice of lis pendens, and then successfully prosecute the fraudulent conveyance action. Only when the creditor has satisfied all three steps will its judgment lien attach to the fraudulently conveyed property. In this case, the Bank had initiated a fraudulent conveyance action against LSC and others, but only as to real property located in Denver County. It did not seek to recover the BME Lots, nor had it filed a lis pendens against these lots. Thus, on the date of the petition, the Bank did not hold a valid judgment lien against

---

1. The Complaint also names Allen Gelman, personal representative for the probate estate of Barry Kaplan, Benjamin L. Henschel, Jeffrey Weinman as chapter 7 trustee of Watson's estate, and Cal–Three, LLC as defendants. Mr. Weinman filed a confession of judgment and judgment entered against him. Cal–Three, LLC released its judgment lien and was dismissed from this case. Finally, on the Plaintiff's request, the claims against Mr. Kaplan and Mr. Henschel have been held in abeyance on the basis that the Plaintiff has reached an agreement in principle with these defendants, conditioned on the outcome of his summary judgment motion against the Bank. Accordingly, following entry of this Order, the only remaining claims in this adversary proceeding will be those asserted against Messrs. Kaplan and Henschel.

the BME Lots. *See Shepler v. Whalen,* 119 P.3d 1084, 1088 (Colo.2005).

In its cross motion, the Bank does not contest the Trustee's assertion that it did not hold a judgment lien on the BME Lots on the date of the petition. Instead, the Bank seeks summary judgment in its favor, declaring that its judgment lien validly attached to the BME Lots *postpetition* by virtue of the "after acquired" clause in Colorado's transcript of judgment statute. This statute states in relevant part:

A transcript of the judgment record of such judgment, certified by the clerk of such court, may be recorded in any county; and from the time of recording such transcript, and not before, the judgment shall become a lien upon all the real estate, not exempt from execution in the county where such transcript of judgment is recorded, *owned by such judgment debtor or which such judgment debtor may afterwards acquire in such county,* until such lien expires.

Colo.Rev.Stat. § 13–52–102(1) (emphasis added). Based on this statute, the Bank asserts that it obtained a judgment lien on the BME Lots on or about September 8, 2009, when LSC acquired its title through the Skyline Order. The Trustee responds that the bankruptcy filing prevented the attachment of any liens after the petition date.

### A. Whether the Automatic Stay Prevented the Attachment of a Postpetition Lien

■ The Bankruptcy Code very clearly cuts off the operation of "after acquired" property clauses, but it does so *expressly* only in the context of consensual liens.

Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security

agreement entered into by the debtor before the commencement of the case.

11 U.S.C. § 552(a). Subsection (b)'s exception to this general rule pertains to allowing the prepetition consensual liens to continue as to proceeds and rents attributable to the creditor's prepetition collateral. 11 U.S.C. § 552(b). Taken as a whole, this statute allows the creditor's lien to continue to attach to its collateral, and any proceeds or rents attributable to its collateral, but it prevents a lien from attaching to any new property acquired by the debtor or the estate postpetition. For whatever reason, Congress only addressed the after-acquired liens arising from consensual agreements. Congress could have ended § 552(a) after the phrase "is not subject to any lien," or "is not subject to any liens arising from a pre-petition debt." With this modification, it would have been clear that both consensual and involuntary liens would be cut off by the operation of this statute, except to the extent of proceeds and rents traceable to the prepetition liens. It would have also been clear that that any "after acquired" property clause, whether imposed by a consensual or involuntary lien, would have no further effect following a bankruptcy filing.

■ How do we interpret Congressional silence regarding involuntary liens and statutorily imposed after-acquired property clauses arising under non-bankruptcy law? Was it an oversight? Was it intentional? Many courts have rushed to fill this gap by relying on general bankruptcy principles, such as the automatic stay, to cut off postpetition involuntary liens. A postpetition "act" to create, perfect, or enforce any lien against property of the estate is expressly prohibited by § 362(a)(4). But if the lien attaches automatically, has a creditor committed an "act" in violation of the stay? Many courts have held that an "act" has occurred even though it occurred

only by operation of law.[2] In so ruling, they have declared that involuntary liens that would otherwise attach to subsequently acquired property do not do so because the automatic stay prevents it. The problem with this "fix" is that, if we read "act" this broadly, then § 552(a) becomes superfluous. The automatic stay would also prevent consensual liens from arising by virtue of after-acquired property clauses postpetition without the need for § 552(a).

On the other hand, if we were to conclude that Congress intended involuntary liens to continue to attach postpetition, but not consensual liens, what possible rationale would exist for preferring involuntary liens in this manner? The Court cannot fathom any reason why involuntary lien creditors would be given more preferential treatment. Reluctantly then, this Court joins the ranks of those courts who interpret "act" in § 362(a)(4) broadly in order to achieve parity, while acknowledging that doing so violates general rules of statutory construction.

■■■ In particular, this interpretation violates the rule of statutory construction known as *expressio unius est exclusio alterius*. Under this maxim, when the "persons and things to which [a statute] refers are designated, there is an inference that all omissions should be understood as exclusions." 2A Norman J. Singer, J.D. Shambie Singer, *Statutes and Statutory Construction* § 47:23 (7th ed. 2007). By referring only to consensual liens in

§ 552(a), and omitting any reference to involuntary liens, this maxim would counsel the Court to find that the omission was intentional and signals Congressional intent to leave after-acquired involuntary liens in place. But a maxim is only intended to aid in finding the legislature's intent. It is "subordinate to the primary rule that the legislative intent governs the interpretation of the statute. Thus, it can be overcome by a strong indication of contrary legislative intent or policy." *Id.* In addition, this maxim "will be disregarded and an expanded meaning given where an expanded interpretation will accomplish beneficial results, where its application would thwart legislative intent made apparent by the entire act. . . ." *Id.*

■■■ Stepping back and viewing the Bankruptcy Code as a whole, it is clear that the foundation of the Code is built on the concept of stopping the efforts of creditors to race to the courthouse to dismember the debtor. While the automatic stay serves to provide the debtor with a breathing spell, it is also intended to maintain the status quo among the creditor body.

The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an

**2.** *United States v. Gold (In re Avis)*, 178 F.3d 718, 722–23 (4th Cir.1999) (interpreting § 362(a)(5)); *Birney v. Smith (In re Birney)*, 200 F.3d 225, 228 (4th Cir.1999) (same); *Lincoln Sav. Bank, FSB v. Suffolk Cnty. Treasurer (In re Parr Meadows Racing Ass'n)*, 880 F.2d 1540, 1544–45 (2d Cir.1989); *Makoroff v. City of Lockport, N.Y.*, 916 F.2d 890, 891–92 (3rd Cir.1990); *United States v. Fuller (In re Fuller)*, 134 B.R. 945, 947–48 (9th Cir. BAP 1992); *In re Earley*, 305 B.R. 837, 843 (Bankr. N.D.Ill.2004); *Shadduck v. Rodolakis*, 221 B.R. 573, 581 (D.Mass.1998); *In re Bellman Farms, Inc.*, 86 B.R. 1016, 1020 (Bankr. D.S.D.1988); *Equitable Life Assurance Society of the United States v. Ballentine Bros., Inc. (In re Ballentine Bros., Inc.)*, 86 B.R. 198, 201 (Bankr.D.Neb.1988); *In re Stack Steel & Supply Co.*, 28 B.R. 151, 155 (Bankr.W.D.Wash. 1983); *Perpetual Am. Bank, FSB v. District of Columbia (In re Carlisle Court, Inc.)*, 36 B.R. 209, 219 (Bankr.D.C.1983). *But see Claussen Concrete Com., Inc. v. Walker (In re Lively)*, 74 B.R. 238, 239–40 (S.D.Ga.1987).

orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

H.R.Rep. No. 95–595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6297 (capitalization altered). The automatic stay preserves the status of creditors as they existed *on the date of the petition,* not allowing some to continue to improve their position. Property of the estate is then to be distributed to all prepetition creditors in accordance with the Code's priority scheme, taking into account the lien rights that some may have acquired prior to the bankruptcy filing. Preservation of this overarching purpose justifies disregarding the general rules of statutory construction in this matter.

In the case of *United States v. Gold (In re Avis),* 178 F.3d 718 (4th Cir.1999), the Fourth Circuit found this interpretation bolstered by Congress' adoption of § 362(b)(9) and (18). Subsection (b) enumerates the exceptions to the general application of the automatic stay. Subsection (b)(9) specifies that the government may take several steps toward obtaining a tax lien, such as an audit, issuance of the notice of tax deficiency, a demand for returns, and an assessment, but it stops short of allowing the tax lien to attach "unless such tax is a debt of the debtor that will not be discharged in the case and such property or its proceeds are transferred out of the estate to, or otherwise revested in, the debtor." 11 U.S.C. § 362(b)(9)(D). "The plain inference flowing from the existence of the § 362(b)(9) exception is that all other efforts to assess or collect taxes remain stayed under § 362(a), unless otherwise exempted under the Bankruptcy Code...." *In re Avis,* 178 F.3d at 723. Likewise, in 1994, Congress enacted § 362(b)(18) to exempt from the reach of the automatic stay the perfection of liens for "an ad valorem property tax, or a special tax or special assessment on real property whether or not ad valorem, imposed by a governmental unit, if such tax or assessment comes due after the date of the filing of the petition." 11 U.S.C. § 362(b)(18). As noted by the Fourth Circuit:

> If the perfection of statutory liens resulting by operation of law were generally excluded from the automatic stay of § 362(a), Congress would not have found it necessary to add § 362(b)(18) exempting the perfection of liens created by state or local law. Because that section applies only to state and local tax liens, it must be inferred that Congress did not intend to exempt the perfection of federal tax liens.

*In re Avis,* 178 F.3d at 723.

The *Avis* court has persuaded this Court that § 362(b)(9) and (18) would be rendered superfluous if it were to interpret § 552(a) and § 362(a)(4) as permitting the perfection of postpetition involuntary liens. Thus, this may be one of the rare times that there is no credible way to harmonize all of these statutes by employing general rules of statutory construction, which leads the Court to conclude that the omission of involuntary liens from § 552(a) was likely an oversight. It gives this Court great pause to reach this conclusion because usually, with enough study and thought, the seeming inconsistencies of the Bankruptcy Code are unraveled and the Court is left with a greater appreciation for how expertly the Code provisions have been woven together. In this instance, however, this Court is unable to find the cohesive thread. Consequently, in the absence of a binding precedent to the contrary, the Court relies on the overarching legislative intent of the Code, to freeze creditors' positions as they existed on the petition date and to prevent one or more creditors from improving their position to the detri-

ment of other creditors, as its basis for concluding that the automatic stay prevented the Bank from acquiring a postpetition lien on the BME Lots.[3]

### B. Whether the Trustee's Claim is Barred by a Statute of Limitations

█ The Bank also argues that the Trustee's suit is time barred by § 546, which requires that avoidance actions under §§ 544, 545, 547, 548, or 553 be commenced within the earlier of two years after the bankruptcy filing, or one year after the appointment or election of a trustee before the expiration of the two-year period. The Court acknowledges that the Complaint includes among its forms of relief a request to "avoid" the Bank's liens. To the extent the Trustee seeks avoidance of the liens, his claim is time barred. But the Complaint also seeks a determination of the validity, extent, and priority of the Bank's judgment liens. There is no filing deadline that pertains to this form of relief. The relief granted to the Trustee in this Order is a declaration that the Bank's judgment lien never attached to the BME Lots by operation of § 362(a). The Court has not employed any of the avoidance statutes to achieve this result. Consequently, § 546 does not apply.

### C. Whether Equitable Considerations Compel a Different Result

█ Finally, the Bank urges this Court to hold that its lien attached postpetition based on general equitable principles. In support of this request, the Bank asserts that it contributed significantly to the Trustee's recovery in this case and the Watson case. It alerted both trustees to

potential fraudulent conveyances. It removed the Denver Action to the bankruptcy court and moved the Court to add LSC as a plaintiff, resulting in LSC's substitution as plaintiff. It did not sleep on its rights in any way because, once the bankruptcy was filed, the Bank no longer had standing to pursue recovery of the lots as a fraudulent conveyance. The Court acknowledges that the Bank has played an important role in this case generally and it certainly has not slept on its rights. But the Court is unaware of any precedent for employing equitable considerations in this manner–to allow one creditor to secure lien rights against property acquired postpetition based on its assistance to the trustee. Nor has the Bank provided any authority for this unique request. Moreover, once again, one of the foundational policies of the Bankruptcy Code is to prevent attempts by creditors to improve their positions postpetition to the detriment of others creditors. Thus, equitable considerations would not compel a different result here.

### III. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that the Trustee's Motion for Summary Judgment is GRANTED and the Bank's Cross–Motion for Summary Judgment is DENIED. Judgment is hereby entered in favor of the Trustee and against the Bank, finding that the Bank's judgment lien did not attach postpetition to the BME Lots or their proceeds.

---

**3.** The Court acknowledges that the Trustee has raised an alternative argument in support of his claim that the Bank's lien never attached to the BME Lots. He argues that, when the Trustee recovered fraudulently conveyed property through piercing the veil of Skyline, it became property of the estate rather than property of LSC. While this argument has merit, the Court need not address it given its ruling regarding the effect of the automatic stay.